**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | )  Case No. 22-cr-40-JEB |
| | ) |
| | ) |
| SANDRA WEYER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**SENTENCING MEMORANDUM OF SANDRA WEYER**

Like so many other ill-starred people, Sandra Weyer came to Washington, D.C., on January 6 to attend the former president's political rally.  After making her way to the Capitol amidst a large crowd, she observed protesters pulling down barricades positioned at the east front of the building.  The 60-year-old encouraged protesters to "hold your ground" and "don't retreat."  Weyer then entered the Capitol through the East Rotunda door and remained in the building for approximately 11 minutes.  Most of that time she spent looking for her brother with whom she had lost contact in the tumult.  Following a bench trial, the Court found Weyer guilty of obstructing an official proceeding, 18 U.S.C. § 1512(c)(2), and four misdemeanor offenses.

Weyer sincerely regrets her misconduct that day.  She apologizes for her contribution to the chaos and for entering the Capitol.  As her many friends and acquaintances explain in letters to the Court, Weyer's actions that day were entirely out of character.  She went to trial not to avoid responsibility for her conduct but because the obstruction-of-justice crime with which she was charged had never been applied before January 6 to protest conduct unrelated to evidence impairment.  Weyer's total offense level under the Guidelines should be calculated at 14, as the specific offense characteristic at U.S.S.G. §2J1.2(b)(2) does not apply for several reasons.  The

1

Court should vary downward by two levels as though the new "zero-point offender" adjustment at §4C1.1 applies.  That leaves a Guidelines range of 10-16 months' incarceration.  Given the novel and uncertain nature of the § 1512(c) offense, the very low probability that the 60-year-old grandmother will recidivate, and the need to avoid unwarranted sentence disparities, Weyer respectfully requests a sentence of 36 months' probation, 12 months' home detention, 200 hours' community service, and $2,000 in restitution.

**Factual background**

    **A.    Weyer's background, family, employment history, and character**

A lifelong resident of Pennsylvania, Weyer has not led an easy life.  As her husband of 40 years explains, she was born in 1963 into a poor family of Sicilian heritage with many siblings.  Weyer Ltrs., Exh. 1, p. 1.  From a young age and continuing until she married, Weyer suffered from substance abuse problems.  Presentence Investigation Report (PSR), dated Aug. 11, 2023, p. 15.

When Weyer married in 1985, however, it had a stabilizing effect on her life.  The couple have two adult sons.  Weyer boasts a large circle of friends and acquaintances in her community. Many have written to the Court to describe her character and to plead for leniency.  Exh. 1.  A few themes touching on her personality emerge from the letters.

First, Weyer is calm, collected, rational, and law-abiding.  That is to say: her behavior at the Capitol was strikingly out of character.  At previous political rallies and events, Weyer was punctilious in following rules and procedures.  That includes prior events related to the 2020 presidential election.  Exh. 1, pp. 5, 6, 8, 9, 14, 18, 20, 23, 32, 36, 39, 42, 46, 51, 55.

Second, Weyer is compassionate, generous, and gives back to the community.  This trait particularly benefited community members during the pandemic.  Weyer chaired neighborhood

2

meetings aimed at helping the sick "negotiate their lives after Covid-19." Exh. 1, p. 3. She was "a strong community leader [who tried] to keep our small business open during those tough times." *Id.*, p. 4.  She gave assistance to "people in our community who were afraid to go out of their homes, people she had never met.  She selflessly assisted them with shopping, appointments and errands, showing them love, kindness and hope." *Id.*, p. 9.  Another friend relates how, during the pandemic, "when so many folks were afraid to leave their homes or go to the grocery store, Sandra offered her time to go along with folks and show them that going outside again can be done.  She helped build people's courage just so they could try and live a normal life again." *Id.*, p. 14.

A local businesswoman recalls that her restaurant was financially suffering during the pandemic.  Sales were down 25% compared to the prior year.  Single mothers on the staff depended on their serving jobs.  Weyer "saw we were hurting and would bring large groups in every week to help boost our sales.  In fact, she was so supportive over the next two years that she is single-handedly one of the reasons we are still open." Exh. 1, p. 29.  Another businesswoman relates how Weyer helped her set up classes to teach CPR and first aid to the community.  *Id.*, p. 33.  And yet another businessman writes about how Weyer "used her own resources to create a fundraiser for us" that helped keep the business concern afloat during the pandemic.  *Id.*, p. 36.

But Weyer's compassionate nature did not appear for the first time in the pandemic.  One family member writes,

> For as long as I have known her, Sandy has [been] and still is always willing to lend a hand to anyone who needs assistance. Friends, family, even people from the surrounding area whom she may not even know. I have witnessed her help numerous people with a multitude of different tasks from rides to doctor appointments, helping with grocery shopping, helping clean older and disabled people's homes to fundraising for those in need and even giving financially from her own pockets. I have not only witnessed, but

3

have also personally experienced the hope, caring and genuine love Sandy has brought
into people's lives, simply by being the person she is.

Exh. 1, p. 11.

Emblematic of her caring nature is Weyer's close relationship with her 80-year-old

mother.  Since her stepfather passed away in 2006, Weyer has been the mother's primary

caregiver.  That would have to change if Weyer is incarcerated.

Finally, Weyer is optimistic and deeply patriotic.  One friend notes with amazement that

Weyer had proudly memorized portions of the U.S. Constitution.  Exh. 1, p. 8.  Another marvels

at Weyer's memorization of lengthy passages in the Declaration of Independence.  *Id.*, p. 14.

Taking a view broader than one calendar day alone—January 6—Weyer's vision of the country

tracks her personality—positive, forward-looking and unselfish.  *Id.*  She keenly appreciates how

lucky she is to be a citizen of this country and strives to give back in return.

### B.      The convictions and presentence investigation report

On June 6, 2023, the Court conducted a one-day bench trial.  Weyer was found guilty of

the following charges: Obstruction of an Official Proceeding and Aiding and Abetting, in

violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted

Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 2); Disorderly and Disruptive

Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 3);

Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4);

and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §

5104(e)(2)(G) (Count 5).

The Presentence Investigation Report (PSR), dated August 11, 2023, identifies U.S.S.G.

§2J1.2 as the controlling guideline.  PSR, ¶ 37.  The base offense level is 14.  *Id.*

4

The PSR applied the specific offense characteristic at §2J1.2(b)(2) because "the offense resulted in substantial interference with the administration of justice. . ." PSR, ¶ 38.

Thus, the PSR calculated Weyer's total offense level at 17.  In Criminal History Category I, that would generate a Guidelines range of 24 to 30 months' incarceration.  PSR, ¶ 93.

**Argument**

**I.**      **Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.**      **The PSR incorrectly applied U.S.S.G. §2J1.2(b)(2)**

The PSR applied the three-level specific offense characteristic at U.S.S.G. §2J1.2(b)(2) "[c]onsidering [that] the offense resulted in substantial interference with the administration of justice, specifically, the proceeding before Congress. . ." PSR, ¶ 38.  Legally and factually, that is mistaken.

5

First, the congressional proceeding on January 6 did not entail "the administration of justice." Any way one looks at it, Congress does not administer justice. That is true under basic separation of powers principles. That is true considering ordinary language usage. *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, __ F. Supp. 3d __ (D.D.C. Oct. 29, 2022) (the "administration of justice" enhancements do not apply to the novel § 1512(c) offense created for January 6 cases).

Every court of appeals to address the question has held that the statutory phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-03 (5th Cir. 2012); *see also United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) ("Section 1503 employs the term 'due administration of justice' to provide a protective cloak over all judicial proceedings."); *United States v. Warlick*, 742 F.2d 113, 115-16 (4th Cir. 1984) ("[O]bstruction of the administration of justice requires . . . some act that will . . . thwart the judicial process."). Many courts of appeals, if not all of them, hold that the Guidelines are interpreted just as statutes are. *United States v. Savin*, 349 F.3d 27, 35-36 (2d Cir. 2003) (courts interpret the Guidelines just as they do statutes); *United States v. Peterson*, 629 F.3d 432, 434 (4th Cir. 2011) (same); *United States v. Bustillos-Pena*, 612 F.3d 863, 868 (5th Cir. 2010) (same); *United States v. Bahhur*, 200 F.3d 917, 927 (6th Cir. 2000) (same); *United States v. Smith*, 989 F.3d 575, 586 (7th Cir. 2021) (same); *United States v. Collins*, 754 F.3d 626, 630 (8th Cir. 2014) (same); *United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (same).

Notably, judges who have denied motions to dismiss the government's novel § 1512(c)(2) offense have reasoned that the motions should not be granted precisely because Congress does *not* administer justice. *E.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 61-65 (D.D.C. 2021) ("Congress's constitutionally assigned duties do not include the

6

'administration of justice. . .'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 23-24 (D.D.C. 2021).

The government's interpretive position is that the Court should isolate the word "justice" and see whether a proceeding that is neither a congressional inquiry nor investigation can fit within the most abstract, tertiary dictionary definition of the term.  However, that is not how courts are supposed to impartially interpret text.  Instead, they look to how the relevant sentence or phrase is used in the context of the statute or rule, and they look to how the words at issue are ordinarily used by relevant speakers.  Judge Easterbrook summed up the relevant principle this way: "Slicing a statute into phrases while ignoring . . .the setting of the enactment. . . is a formula for disaster."  *Herrmann v. Cencom Cable Assocs., Inc*., 978 F.2d 978, 982 (CA7 1992); *see also Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F.2d 1154, 1157 (CA7 1990) ("You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities."); *see also Dubin v. United States*, __U.S.__, 143 S. Ct. 1557, 216 L. Ed. 2d 136, 154 (2023) (criticizing government for "riffing on equivocal language" in criminal statutes).

The *Seefried* court demonstrated that the government's novel interpretation of "the administration of justice" is inconsistent with decades of recorded usage by the public:

> The primary linguistic community using and understanding the Sentencing Guidelines is an informed legal audience—most notably, lawyers and judges. Unlike most statutes, which are at least theoretically intended to be read and understood by citizens, the Guidelines are a practitioner's guide to federal sentencing. The Court therefore focused on the Corpus of Caselaw Access Project (COCAP), which compiles the text of federal and state court decisions. *See* https://lncl8.lawcorpus.byu.edu/.

> But just in case one thinks the Guidelines should be read like criminal statutes—directed to the general public—the Court also searched the Corpus of Historical American English (COHA), which collects sources across genres, including fiction, magazines, newspapers,

and academic articles. *Cf. Rice*, 36 F.4th at 583 n.6 (looking to a database collecting "documents an ordinary speaker of English would interact with regularly" when interpreting a criminal statute). At the very least, it would be notable if these corpora produced wildly different results. As it turns out, they did not.

The Court queried the COCAP for the years 1977-1987. This period represents the decade before and including the year in which the Commission promulgated § 2J1.2. *See* U.S.S.G. § 2J1.2 (effective Nov. 1, 1987). *Cf. Safelite*, 930 F.3d at 444 (Thapar, J., concurring in part and concurring in the judgment) (looking to a ten-year period to generate a sample of written text around the time Congress first passed the relevant language). This search returned 14,118 hits, or "concordance lines." Given such a large universe, the Court reviewed a random sample of 375 concordance lines containing the phrase "administration of justice" to see what sorts of official proceedings were discussed. This sample size produces a 95% confidence interval. A random sample can be generated through the database itself by filtering for a specific number of results.

The most frequent usage of the "administration of justice"—about 65% of the total hits—corresponds with the sense described above: a judicial proceeding deciding legal rights. The phrase appeared in conjunction with witness tampering, contempt of court, various evidentiary privileges, the effect of jury instructions on court proceedings, and the conduct of juries. The phrase also accompanies issues of judicial management, including delays in court proceedings, repeat litigants, and even courtroom dress code. Other hits dealt with media access to judicial proceedings. Finally, some hits reflected more general concerns about retroactivity and the "fair," "proper," "effective," or "thorough" administration of justice by courts.

The next most common context in which the "administration of justice" appeared—around 25% of hits—involved disciplining judges or lawyers for conduct that interfered with judicial proceedings. Some hits referenced violations of various ethical rules, contempt of court, recusal, disqualification of counsel, and perjury when a lawyer testified before a grand jury. Again, the customary usage of the phrase was closely linked with judicial proceedings, or an actor who is intimately involved with the judicial process.

Another category of note—about 4% of hits—involved law enforcement activities. Some hits referenced conduct such as resisting arrest. Others discussed the need for anonymous informants to promote cooperation with law enforcement, the rationale for the exclusionary rule, and prosecutorial discretion. One discussed setting standards for roadside intoxication tests. These hits differed from those described above in that they did not always involve a formal proceeding or a judicial body. But they all contemplate the state's application of force or the government's role in investigating and prosecuting crimes.

**In contrast, the least common usage of "administration of justice" was as a broad term referring to government function generally. The Court identified three such entries out of the 375 it coded**. One dealt with a public utility commission that discussed

the administration of justice in broad terms. Another noted that local commissioners' power to issue licenses involves the administration of justice. And another suggested that Texas counties are involved in the administration of justice. **No entries discussed a Congressional proceeding.**

*Seefried*, 2022 U.S. Dist. LEXIS 196980, at *16-18 (emboldening added).

Linguistic analysis like this raises a question whether, in ignoring the public's understanding of language and placing novel interpretations on terms, a court is implementing the will of the Commission (or Congress) or instead creating on-the-spot Guidelines tailored to a specific cohort of defendants, almost like a bill of attainder.  The most one can say of the government's position is that the phrase "administration of justice" could be regarded as ambiguous in the context of congressional proceedings that involve no inquiry or investigation. In that case, the rule of lenity counsels against application of §2J1.2(b)(2) here.  *E.g.*, *United States v. Hamner*, 21-cr-689-ABJ (D.D.C. 2021) (declining to apply ambiguous guideline under the rule of lenity).

Second, even if Congress "administers justice," §2J1.2(b)(2) does not apply to Weyer's conduct.  The enhancement requires the government to prove that *the defendant's* conduct "resulted in" substantial interference with the administration of justice.  §2J1.2(b)(2).  That is, there is a causal element the government must establish.  The PSR errs by assuming that the specific offense characteristic can be applied to Weyer if *the riot overall* "resulted in" substantial interference.  PSR, ¶ 38 ("As a result of the *January 6, 2021 event*. . .") (emphasis added).  But the provision clearly states that the question is whether the defendant's offense "resulted in" substantial interference.

Here, the government has not shown by a preponderance of the evidence that Weyer's conduct caused the joint session "to be halted while legislators were physically evacuated for their own safety." PSR, ¶ 38.  That is so whatever causal test the Court applies (e.g., but-for or

proximate cause).  Weyer entered the Capitol at 2:41 p.m.  By that point, Congress had been

recessed for nearly 30 minutes.  She remained in the building for approximately 11 minutes.

After the joint session resumed in the evening of January 6, legislators continued debating

electoral vote counting issues for hours.  Thus, it is not possible to prove that *Weyer's* conduct

"resulted in" legislators being evacuated or even that her conduct meaningfully delayed the vote

count, much less "substantially."  At the very least, "substantial interference" should incorporate

some relative comparison between rioters.  If the conduct of every protester in a crowd of

thousands "substantially interferes," the term "substantial" loses all force.  Weyer's conduct

would be regarded as just as severe as the conduct of the leader of the Oath Keepers or the

former president.  But, as shown below, Weyer's conduct was less severe than the average felony

defendant's.  As the Court knows, she spent most of her brief period inside the building

searching for her brother.

For all these reasons, the Court should not apply §2J1.2(b)(2).

## III.   The Court should vary downward as though the "zero-point offender" adjustment applies

As the Court knows, Guidelines Amendment 821 relating to criminal history will become

effective November 1, 2023.  On August 24, the Commission voted to allow for delayed

retroactive application of the amendment.  *U.S. Sentencing Commission Votes to Allow*

*Retroactive Sentence Reductions and Announces Its Next Set of Policy Priorities*, U.S.

Sentencing Commission, Aug. 24, 2023, available at: https://www.ussc.gov/about/news/press-

releases/august-24-2023.

Under a new adjustment at U.S.S.G. §4C1.1, if the defendant meets certain criteria the

Court should "decrease the offense level determined under Chapters Two and Three by 2 levels."

*Amendments to the Sentencing Guidelines (Preliminary)*, U.S. Sentencing Commission, Apr. 5,

2023, available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.  The key factor is whether the defendant received any criminal history points from Chapter Four, Part A.  *Id.*

Here, Weyer did not receive any criminal history points.  PSR, ¶¶ 47-51.  Her offense did not involve violence.  Thus, the Court should decrease the offense level to 12.  Applying §4C1.1 now will conserve judicial resources, as otherwise Weyer would be required to file a post-sentencing motion seeking the same relief in November 2023.

## IV.     The § 3553(a) factors favor a downward variance

### A.     The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) warrant a significant downward variance in Weyer's case: (1) even though the court has accepted the government's novel § 1512(c)(2) charge, which drives the sentencing range, the question is at least a close one, meriting leniency in sentencing if not lenity; (2) first-time offender status and atypical conduct; (3) Weyer's good deeds; (4) her family and community support; and (5) her sincere remorse.

#### 1.     Leniency is warranted on the novel § 1512(c)(2) charge

Along with most judges in this district, this Court has declined to dismiss the government's novel § 1512(c)(2) charge.  However, it would probably agree that, at the least, the question is a close one.  At least three judges in this circuit—including two on the court of appeals—have found that the government's evidence-free interpretation of the obstruction-of-justice offense is "breathtakingly" overbroad.  *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023); *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022).  Even the panelist who authored *Fischer*'s lead opinion acknowledged that before January 6 no court had applied §

1512(c)(2) to acts of protest not intended to affect the integrity or availability of evidence. *Fischer*, 64 F.4th at 338.

The Court has heard argument that applying a novel construction of a criminal statute to conduct that occurred before any court's adoption of the new interpretation can amount to a due process violation akin to an ex post facto law. *United States v. Lanier*, 520 U.S. 259, 264 (1997) (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964)). A fortiori, then, if such a novel charge is still permitted, leniency is certainly appropriate. Even if she had reviewed the relevant statute on the morning of January 6, Weyer could not have known that what appeared to be a trespass in the Capitol that day would constitute a novel obstruction-of-justice offense, the first in Chapter 73 that does not entail evidence or an investigation. The point is not that ignorance of the law is an excuse. The point is that even if we posit a public that is aware of Section 1512(c), it could not have been fairly notified of a future interpretation of the statute that decouples the crime from evidence and investigations for the first time in its 20-year history.

Leniency becomes even more appropriate if the court determines that, notwithstanding the ordinary meaning of "the administration of justice," a special meaning applies for January 6 defendants. In that case, three extra levels are added to Weyer's total offense level. Just as with the novel crime itself, even if Weyer had read the Guidelines on her way toward the Capitol, she could not have known that Congress's proceeding that day would be later regarded as "the administration of justice," something that happens in courts, not a legislature.

## 2. First-time offender and atypical conduct

The fact that Weyer is a first-time offender, and that the offense conduct is atypical for her, is an appropriate basis for a downward variance. *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month

range to below the calculated Guidelines range was reasonable and permissibly took into account

the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143

(10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement

from recommended Guidelines range of 65-78 months imprisonment supported by district

court's finding of several factors including that defendant had no felony criminal record and his

offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009)

(affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Weyer's lack of criminal history does not

mean that it is inappropriate for the Court to vary downward on the same basis.  *See United*

*States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to

enter sentencing variances based on factors already taken into account by the Advisory

Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a

sentencing] variance.").

The many letters submitted on Weyer's behalf clearly demonstrate that her conduct on

January 6 was atypical.  Exh. 1, pp. 5, 6, 8, 9, 14, 18, 20, 23, 32, 36, 39, 42, 46, 51, 55.

### 3.     Weyer's good deeds

After *Booker-Gall-Kimbrough*, the case law is clear that good works, both exceptional

and otherwise, whether performed pre-indictment or post-indictment, are a valid basis for a

downward variance.  *See Tomko*, 562 F.3d at 560 (3d Cir. 2009); *United States v. Thurston*, 544

F.3d 22, 25-26 (1st Cir. 2008).

As outlined above, Weyer's whole adult life has been distinguished by good deeds she

has performed for her community's benefit.  The letters submitted on her behalf show that her

actions have saved local businesses and jobs, educated the public in CPR and first aid, and

enriched the lives of family members and friends.  This history of good deeds warrants a downward variance.

### 4.    Weyer's community and family support

The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As shown above, Weyer has an extensive network of friends and family members that can provide her with the financial and emotional support she needs for successful rehabilitation. The letters submitted on her behalf demonstrate that Weyer has their unequivocal support.

### 5.    Weyer's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Weyer is earnestly remorseful for her misconduct on January 6.  In her allocution, she will apologize to law enforcement and members of Congress and their staff.  That Weyer challenged the application of § 1512(c) here does not reveal a lack of remorse.  The Guidelines recognize the point.  U.S.S.G. §3E1.1 cmt. n. 2 (recognizing that defendants can still receive an acceptance of responsibility reduction where they go to trial to "challenge [] the applicability of a statute to [her] conduct").

### B.      Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  Sentencing Weyer to a term of incarceration would create unwarranted sentence disparities along several levels.

Consider the case of **Matthew Wood**. Wood was convicted of every offense of which Weyer was found guilty.  *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), Gov't Sentencing Mem., ECF 55, p. 46.   Wood's conduct, however, was far more severe than Weyer's.  Before January 6, Wood vowed to "raid Congress" and "be brave heart in that bitch." *Id.*, p. 2.  Terrifyingly, he compared his red car to "the blood I will shed" in D.C.  *Id.*, p. 60.

Wood was one of the first rioters in the building and one of the last to leave.  *Id.* In contrast to Weyer's 11 minutes in the building, Wood remained inside for 80 minutes.  *Id.*, p. 59. But Wood did not spend all that time looking for a family member, as did Weyer.  He was constantly encouraging other rioters to enter the building and breach barricades.  *Id.*

Wood received a sentence of 36 months' probation with 12 months of home detention. *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), ECF 65.  Sentencing Weyer to a term of incarceration would create an unwarranted disparity with Wood.

Or consider **William Isaacs**.  Isaacs was not only a key member of the Oath Keepers militia, he was also convicted of conspiring to violate § 1512(c), as well as several other felonies of which Weyer is not guilty.  *U.S. v. Isaacs*, 21-cr-28-APM (D.D.C. 2021).  Plainly, the conduct of the Oath Keepers, many of whom were found guilty of seditious conspiracy, was far more serious than Weyer's.  Isaacs was sentenced to 60 months' probation, 500 hours of community

service, and 18 months of home confinement.  Sentencing Weyer to a term of incarceration

would create an unwarranted disparity with Isaacs.

A number of  § 1512(c) defendants have been sentenced to terms of incarceration

between eight and 10 months.  *U.S. v. Morrison*, 21-cr-334-TJK (8 months); *U.S. v. Puma*, 21-cr-

454-PLF (9 months); *U.S. v. Hodgkins*, 21-cr-188-RDM (8 months); *U.S. v. Michetti*, 21-cr-232-

CRC (9 months); *U.S. v. Stottlemyer*, 21-cr-334-TJK (8 months); *U.S. v. Weeks*, 21-cr-247-TFH

(10 months).  But, again, the conduct of these defendants was far more severe than Weyer's:

*Morrison*:  Unlike Weyer, Morrison entered sensitive areas of the Capitol, including the

Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their

documents; remained in the Capitol for an hour; and lied to FBI agents.  *U.S. v. Morrison*, 21-cr-

334-TJK, ECF 106, p. 2.

*Puma*: Unlike Weyer, Puma planned on "storming the House of Representatives"; scaled

a wall and climbed through a broken window to enter the Capitol; entered Senator Merkley's

office and smoked marijuana there; promised future violence.  *U.S. v. Puma*, 21-cr-454-PLF,

ECF 55, pp. 2-3.

*Hodgkins:* Unlike Weyer, Hodgkins "entered the Capitol wearing a backpack containing

protective eye goggles, rope, and white latex gloves. . ." He entered the Senate chamber and took

celebratory photographs.  He remained in the building about three times as long as Weyer.  *U.S.*

*v. Hodgkins*, 21-cr-188-RDM, ECF 32, p. 4.

*Michetti:* Unlike Weyer, Michetti explicitly stated that his goal in entering the Capitol

was to "stop the vote." Michetti confronted law enforcement officers in the building.  He refused

to leave the building until he was tear gassed multiple times.  *U.S. v. Michetti*, 21-cr-231-CRC,

ECF 46, p. 1.

*Stottlemyer:* Unlike Weyer, Stottlemyer entered sensitive areas of the Capitol, including the Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their documents; remained in the Capitol for an hour.  *U.S. v. Stottlemyer*, 21-cr-334-TJK, ECF 105, p. 2.

*Weeks***:** Unlike Weyer, Weeks planned on invading the Capitol.  Weeks climbed a wall and personally overturned bike racks to breach the Capitol.  He waved other rioters into the building.  *U.S. v. Weeks*, 21-cr-247-JDB, ECF 96, p. 2.

Thus, Weyer's sentence should be milder than the sentences of these defendants.

Finally, a term of incarceration would create unwarranted disparities between Weyer's sentence and sentences imposed on parading/demonstrating misdemeanants in January 6 cases. The distinction between the novel § 1512(c) offense and a Class B parading misdemeanor is one without material legal significance.  If one "demonstrates" or "parades" in the Capitol (40 U.S.C. § 5104(e)(2)(G)) during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object. § 1512(c)(2).  But those charged under Section 1512(c)(2) and who therefore allegedly acted with an "unlawful purpose" (the government's definition of "corruptly," satisfied by any trespass or parading charge, according to the government) shared that purpose with the misdemeanants who "demonstrated" or "paraded" against electoral vote certification in the Capitol.  In many instances, the conduct of these probationary misdemeanants was more disruptive than Weyer's.  Department of Justice January 6 Sentencing Chart, dated Aug. 15, 2023, available at: https://www.justice.gov/file/1593211/download.  Here are some examples:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. |

| | | | |
|---|---|---|---|
| | | | Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |

18

| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
|---|---|---|---|
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |

| | | | |
|---|---|---|---|
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |

| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

In short, sentencing Weyer to a term of incarceration would create dozens or even hundreds of unwarranted sentence disparities.

## C.   The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

Weyer is a grandmother in her 60s with no criminal history.  Those biographical facts alone imply she is highly unlikely to recidivate.  *Recidivism Among Federal Offenders*: *A Comprehensive Overview*, U.S. Sentencing Commission, Mar. 2016, p. 23, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (defendants older than 60 at sentencing have a rearrest rate lower than 15%).  Prior to January 6, nonviolent demonstrators at the Capitol who violated relevant law were typically penalized under a process called "post and forfeit": they paid to have their demonstration-related case dropped for approximately $25-100.  ACLU, District of Columbia, Demonstrations in D.C., available at: https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc.  That was deemed sufficient deterrence.  In contrast, Weyer was charged with a felony offense in federal court.  FBI agents came to her home.  A sentence of incarceration—along with its destabilizing effect on her family—is not needed to deter Weyer from entering the Capitol again without authorization.  Together with scathing

media criticism and social ostracization, a federal conviction— as well as a sentence of probation, home detention, and significant fine—will well and truly deter Weyer.  The heavy shame Weyer has experienced is itself a guarantee of deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions"); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

For all the foregoing reasons, Weyer respectfully requests a sentence of 36 months' probation, 12 months' home detention, 200 hours' community service, and $2,000 in restitution.

Dated: September 7, 2023                    Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Sandra Weyer*

22

**<u>Certificate of Service</u>**

I hereby certify that on the 7th day of September, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

<u>*/s/ Nicholas D. Smith*</u>
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Attorney for Sandra Weyer*