# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-00040 (JEB)** |
| **SANDRA S. WEYER** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Sandra S. Weyer to 30 months' incarceration, the high-end of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $170 special assessment.

## I.      INTRODUCTION

The defendant, Sandra S. Weyer, a 60-year-old mother of two and high school graduate, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Weyer was among the first rioters to enter the Capitol Grounds by breaching police barricades on the East Front of the U.S. Capitol.  She documented her entire time at the Capitol on Facebook Live, videoing her egregious conduct openly in real-time.  At the metal barriers, Weyer not only encouraged others to "tear this shit down" in reference to the metal barricades set up by police on the East Front, but she also admitted that she "personally helped take down the barricades at the front of the Capitol" and that she was "laser focused on breaking the barricades."  After breaching the East Front metal barriers, Weyer paraded across the East Plaza to the bottom of the Central East Steps where she and her fellow rioters dramatically outnumbered the U.S. Capitol Police ("USCP").  Weyer and the mob marched up the steps and forcibly pushed and shoved their way toward the Rotunda Door.  Once outside the Rotunda Door, Weyer commanded her fellow rioters to "hold your ground," "charge," "don't retreat," and "break that door."  After the door was breached, Weyer forced her way into the Capitol building pushing past USCP officers.  Once inside, she first went directly toward the Rotunda and declared, "This is awesome.  We did it." Weyer was in the Capitol building for approximately ten minutes.  However, she remained on the Central East Steps for approximately an hour and fifteen minutes after exiting the building.  While outside on the Central East Steps, Weyer continued to video herself bragging about her exploits. She also responded in real-time videos to her social media followers encouraging them to undertake similar illegal conduct at their local state capitols.

The government recommends that the Court sentence Weyer to 30 months' incarceration, which is the high-end of the applicable 24-to-30-month range.  A 30-month sentence reflects the gravity of Weyer's conduct, her lack of remorse, and the need to deter Weyer and others from similar conduct.

## II.    FACTUAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government refers the court to the facts presented at trial, specifically the testimony provided by the U.S. Capitol Police Officers describing the events on January 6, 2021, and the attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Breach of the Capitol Building on the East Front and the Rotunda Door*

One of the main points of entry for rioters on January 6, 2021, was through a set of ornate double doors at the top of the Central East Steps. These doors have been referred to as the Columbus Door or the Rotunda Door. The Rotunda Door is often regarded as the main door into the Capitol Building. In Images 1 and 2 below, the Rotunda Door is  circled in red.



*Image 1 – Screenshot from https://youtu.be/CqBB3Mt06XA*

On January 6, 2021, the outer perimeter of the Capitol Grounds, made up of metal-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States

Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling through the grounds. In Image 2, the barricades on the East Front are indicated with dotted lines.



*Image 2: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

On the afternoon of January 6, a crowd gathered on the East Front, outside the perimeter. At about 1:58 p.m., individuals in the northeast corner began to tear down the barricades and move into the East Plaza.



*Image 3: Screenshot from https://youtu.be/z1gODZvbhqs*

4

Shortly thereafter, rioters began pushing against police and tearing down barriers throughout the perimeter.



*Image 4: Screenshot from Capitol Security Video*

The rioters pressed forward, through the East Plaza.



*Image 5: Screenshot from https://youtu.be/185f3LPxUYU*

The USCP established a temporary police line at the base of the East Central Steps but were soon overrun.  At about 2:06 p.m., rioters flooded up the steps, between the columns, and on to the surrounding balconies.



*Image 6: Screenshot from Capitol Security Video*

The USCP officers retreated to the Rotunda Door and were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas before they escaped the area.



*Images 8 and 9: Screenshots from https://youtu.be/MVullQb-Lec*

Rioters outside the Rotunda Door attacked the police and tried to break in, smashing the windows in the process. At about 2:25 p.m., a rioter already inside the Capitol opened the door from the inside. Rioters rushed through the door, as others tried to jam a flag through the door to keep it open.  Other members of the exterior crowd assaulted officers who stood with their backs to the Rotunda Door, defending it.



*Images 10 and 11: Screenshots from Capitol Security Video*

Rioters fought officers to keep the door open, pushing and pulling them out of the way, trying to jam their bodies in the doorframe. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.



*Image 12: Screenshot from Capitol Security Video*

While officers stood guard at the door, and then barricaded the door with benches, tensions remained high. Rioters outside continued yelling and chanting and skirmishing with officers, trying to breach the door again. At about 2:37 p.m., rioters from the Rotunda moved towards the doors in an effort to open it, while USCP officers rushed to guard the door from the inside.



*Image 13: Screenshot from Capitol Security Video*

At about 2:39 p.m., the rioters pushed forward, crushing the police, and forcing the door open again.



*Image 14: Screenshot from Capitol Security Video*

Once the door had been breached, and as a security alarm blared, hundreds of rioters poured into the building and past overwhelmed USCP officers, who were pinned against the door.



*Image 15: Screenshot from Capitol Security Video*

Rioters continued to push through the Rotunda Door for another hour, battling with police over control of the door. A combined force of USCP and MPD officers were finally able to secure the Rotunda Door at around 3:30 p.m.



*Image 16: Screenshot from Capitol Security Video*

**B. Weyer's Role in the January 6, 2021, Attack on the Capitol**

Weyer's frustrations motivating her to storm the Capitol began in the days leading up to the attack on January 6, 2021, in her home state of Pennsylvania. Upset over the election results, Weyer participated in rallies and protests to decertify the election in favor of her chosen candidate.



*Image17: Screenshot from Government's Trial Exhibit 201.13, Weyer circled in red*

9

When those lawful efforts failed to achieve her desired result, Weyer and her associates decided to come to Washington, D.C.   They drove a van approximately three hours from Mechanicsburg, Pennsylvania to Washington, D.C.   Weyer, who was in the front passenger seat, led her group in chants of "four more years!" during the drive.   She recorded and published her trip to her Facebook Live followers on social media in real-time.   *See Government's Trial Exhibit 202.2.*[2]

By approximately 1:58 p.m. Weyer and her fellow rioters were at the metal barricades on the East Front of the U.S. Capitol.   At that time, Weyer filmed herself commanding rioters to "go" and "tear it down" referring to the metal barrier between the mob and law enforcement.   *See Government's Trial Exhibit 203.2.*   Although Weyer was behind her camera in most of her videos, she also appeared in other rioters' recordings and was easily spotted in the crowd because of her distinctive hair and her red hoodie with the words "Trump 2020" printed on it.



*Image 18: Screenshot from Government's Trial Exhibit 316, Weyer circled in red*

[2] All referenced video exhibits were admitted at trial.   For purposes of sentencing, the government has compiled the trial exhibits referenced in this memorandum into one omnibus video exhibit attached to this motion as Government's Exhibit A.   The attachment was shared with the Court and Counsel via USAfx.

At 1:59 p.m. while still behind the barricades, Weyer aided another rioter who fell while tearing down the metal barriers.  Once the barricades were down, Weyer filmed herself walking through the East Plaza stating that she was "storming the Capitol" and that she had "broke down the barriers." *See Government's Trial Exhibit 204.2.*  She celebrated her triumphant defiance of the police by chanting "U.S.A." several times as she illegally made her way toward the Central East Steps.  Once there, Weyer again recorded herself commanding her fellow rioters to "hold your ground." *See Government's Trial Exhibit 204.3.*

While on the Capitol Steps, Weyer chanted "Stop the steal" in reference to the election and claimed that her actions were justified because she was "taking our country back." *See Government's Trial Exhibit 205.5.*  As Weyer advanced up the steps, she celebrated, yelling "holy fucking shit, we're at the top of the Capitol Steps after breaking through the barricades, this is what patriotism looks like." *See Government's Trial Exhibit 204.6.* Despite efforts by law enforcement to disburse the crowd, Weyer pressed on.  She alerted her followers on social media that the Capitol Police were using "tear gas and flash bangs," to disburse the mob nonetheless, Weyer yelled at other rioters "don't retreat." *See Government's Trial Exhibit 204.7.*



*Image 19: Screenshot gettyimages, photograph by Robert Nickelsberg, Weyer circled in red*

By 2:11 p.m. Weyer pushed her way to the top of the Central East Steps announcing to her

social media followers that she was "trying to break the fucking doors down."  *See Government's Trial Exhibit 204.8.*  Ten minutes later, Weyer moved closer toward the door chanting "break that door," in reference to the Rotunda Door.  *See Government's Trial Exhibit 204.10.*

At 2:26 p.m. after rioters were able to open the Rotunda Door, Weyer, now feet away from the entering the Capitol, screamed at her fellow rioters to "charge" and "forward march" through the open door.  *See Government's Trial Exhibit 205.2 and 205.3.*  Two minutes later, USCP officers regained control over the door and closed it.  At that moment, Weyer reacted to the door closing saying "Fuck" as the door to the Capitol shut, leaving her outside.  *See Government's Trial Exhibit 205.4.*  Moments later, rioters forced open the Rotunda Door again.  Oath Keepers, dressed in paramilitary garb, moved past Weyer who encouraged their entry into the Capitol telling them, "go guys, we got you" as the militia group entered the building.  *See Government's Trial Exhibit 206.3.*

At  2:39 p.m. Weyer crossed the threshold of the Rotunda Door into the Capitol building.  *Id.*  Once inside the building, Weyer exclaimed – "This is awesome!  We did it!" "Stormed the Capitol" and "This is what happens when you piss off patriots."  *See Government's Trial Exhibit 206.4, 206.5 and 206.8.*  Weyer remained in the Capitol building for approximately 10 minutes.  While inside, she paraded around corridors looking for legislators, including stopping and asking a fellow wandering rioter "is anyone there" in reference to an abandoned office room.  *See Government's Trial Exhibit 206.7.*  Weyer continued videoing her escapades inside the Capitol.



*Image 20: Screenshot from Trial Exhibit 206.9*

Alarms blared the entire time Weyer was inside the Capitol building, and she received an emergency alert on her cell phone notifying her that District of Columbia authorities mandated a 6 p.m. curfew because of the riot at the Capitol.  Upon leaving the building, Weyer declared victory for her cause stating, "whose house, our house" and "I think we wanted to show them we could do it."  Indeed, she and hundreds of other rioters took over the U.S. Capitol by force and violence delaying for over six hours the peaceful and constitutional transition of power.

### C.  Weyer's Statements about her actions on January 6, 2021

By 2:56 p.m. Weyer was outside the Capitol building, but she remained on the Central East Steps gloating about her exploits via live stream video to her social media followers.  She described in detail what she had done:

> [S]o there was barricades way back there [. . .] so they took them down, they
> bum rushed the Capitol police, made it the whole way up here to the top of
> the Capitol, got maced and flash bombs or whatever they are, broke through
> the doors right there, went into the Capitol, but no reps were there they all

left underground, I'm pretty sure."

*See Government's Trial Exhibit 207.2.* Weyer's summed up her flippant attitude toward the

massive destruction and unprovoked violence the rioters had caused:

> [Y]ou know what the main-stream media does to Trump supporters and
> patriots, they're always going to say that we're the violent ones, I haven't
> seen anybody here be violent just a couple small maybe 1, 2, 3 people.  I've
> been up front the entire time, the entire time,  I was helping break down the
> barricades too and get into the door.  [ . . . ] I would say this is pretty peaceful,
> this is pretty peaceful.  You know breaking down some barricades and into
> the Capitol that we own isn't really violent.

*See Government's Trial Exhibit 207.11 and 207.12.*

In the immediate aftermath of her actions, Weyer showed no remorse for her conduct.  To

the contrary, she incited her social media followers to copy her actions in their local jurisdictions:

> [Y]ou guys if we do not take this country back now, we are screwed.  Get
> out to your capitols and start fighting back just like the people here in D.C.
> did today, you got to fight back.  They ain't gonna fucking shoot ya, maybe
> with some pepper spray or flash bangs or something.  Look at these patriots
> here they ain't afraid – they stormed the damn Capitol.  [ . . .]  Patriots are
> tired of it, we were the nice ones for a long time, I personally think we
> should have done this months ago. […] PA Capitol this is exactly what we
> need to do at the Pennsylvania Capitol, yeah these patriots are standing their
> ground.

*See Government's Trial Exhibit 207.5, 207.9, and 207.10.*

When her social media followers appeared to question her actions, Weyer proudly justified

the use of force and violence to enter the Capitol:

> [Y]es, it is the way John, we've waited and we've waited and we've been
> the nice people, we went to the rallies, we protested, we called our reps and
> our senators, we did everything we were supposed to do.  It's time to do
> this.

*See Government's Trial Exhibit 207.7.*

Even the potential for criminal prosecution did not deter Weyer from advocating that others

should follow her lead and disregard any possible punishment:

They ain't gonna, I mean, think they'll charge all these patriots? No way Kathy, maybe the ones on the Senate floor, I don't know. [ . . . ] BLM and ANTIFA won't get charged, you think they gonna really charge all these patriots, well they say the FBI and all is coming in to charge us.  Not going to happen.  If they do, we'll do what they do in Pennsylvania when the restaurants liquor license get a fine, they don't pay 'em.  We'll take our day in court. [ . . . ] [T]ruth is I'm ready to die on this day for my country if that's what it takes, I'm alright with that.

*See Government's Trial Exhibit 207.15, 207.16 and 207.17.*

In the aftermath January 6, Weyer continued to justify her actions and blame others for pushing her to the edge.



| | |
|---|---|
| **Author** | Sandy Pomeroy Weyer (Facebook: 100015433067547) |
| **Sent** | 2021-01-07 18:14:31 UTC |
| **Body** | Oh okay I see. I was at the very front when the barricades were taken down and when we stormed the Capitol. I didn't see anything suspect as far as Antifa goes. I was laser focused on breaking through the barricades and getting to the top of the Capitol steps...to be quiet honest with you. I seen absolutely no violence or rioting from any Patriots. I did witness physical confrontation between the cops and those of us at the barricades. But there were no punches thrown and no weapons used by either side. It was the cops and the Patriots pushing against each other until the barricades were removed. I saw several people fall to the ground including a cop. Once the barricades were down and we went to the steps I saw a couple Patriots fall to the ground from all of the pushing trying to get to the steps. I saw cops and Patriots clash at the very top...keep in mind I was pretty much at the front of everything so I am giving my perspective from that point. The Patriots were definitely refraining from any physical altercations with the police. As a matter of fact I heard a lot of "don't hurt the cops" in the crowd...so I felt for sure they were Patriots. The cops did stand down and I felt that was because they knew the crowd was too big to contain. We were pepper sprayed, we felt the repercussions of the flash bangs, and whatever else they were using burned our skin, lips, eyes, and throats. We are now trying to research and see if Antifa infiltrated our people...we're watching what you posted. We are law and order Patriots in my group...but we felt we were pushed to take some kind of action in hopes of implementing change...after months and years of taking the Left's abuse...and we all believe the Pandemic is nothing but a scam for what is still unfolding. |

*Image 21: Trial Exhibit 402 Screenshot of Facebook Post*

Weyer expressed no remorse for her actions after January 6, instead, she proclaimed joy over her role in the insurrection.

**Time**  2021-01-07 03:47:05 UTC
**Type**  Comments
**Summary**  Sandy Pomeroy Weyer replied to a comment. `@[525011696:2048:Jenn Dodge] I did what needed to be done! I'm happy `

Image 22: Screenshot Sandra Weyer Facebook Post

On January 9, 2021, Weyer's Facebook account was disabled.  On June 28, 2021, Weyer was arrested at her residence.

### III.     THE CHARGES AND TRIAL

On February 2, 2022, a federal grand jury returned an indictment charging Weyer with five counts: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).  On June 6, 2023, Weyer was convicted of all five counts following a bench trial.

### IV.     STATUTORY PENALTIES

Weyer now faces sentencing on all five counts. As noted in the Presentence Report ("PSR"), the statutory maximum imprisonment terms are 20 years on Count One (Obstruction of an Official Proceeding); one year each on Count Two (Entering and Remaining in a Restricted Building or Grounds) and Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and six months each on Count Four (Disorderly Conduct in a Capitol Building) and Count Five (Parading, Demonstrating, or Picketing in a Capitol Building).  PSR ¶¶88-92.

The maximum terms of supervised release are three years for Count One; and one year for

16

Counts Two and Three.  PSR ¶¶ 98-99.  The maximum fines are $250,000 for Count One, $100,000 for Counts Two and Three, and $5,000 for Counts Four and Five.  PSR ¶¶ 118-20.  The mandatory special assessment total is $170.  PSR ¶¶ 121-23.

## V.     THE SENTENCING GUIDELINES AND GUIDELINE ANALYSIS

As the Supreme Court has instructed, "[a]s a matter of administration and to secure nationwide consistency, the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") should be the starting point and the initial benchmark" for determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 49 (2007).  The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.  Therefore, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

While the government agrees with the sentencing range calculated by the Probation Office, the PSR does not include a Guidelines analysis for each of the counts for which Weyer was convicted. *See* PSR ¶¶ 25-45. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 33-34) that Counts One, Two and Three group—a conclusion

with which the government agrees—but does not set forth the Guidelines calculation separated for

each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—Obstructed and Aided and Abetted the Obstruction of an Official Proceeding before Congress**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Total | 17 | |

**Count Two: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted area**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 17 (from Count One) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Weyer entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level for that offense (plus any adjustments) should be applied. |
| Total | 17 | |

### Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly or Disruptive Conduct in a Restricted Building or Grounds

| Base Offense Level: | 10 | U.S.S.G. §2A2.4 |
|---|---|---|
| Total | 10 | |

### Counts Four and Five: Disorderly or Disruptive Conduct in a Capitol Building, and Parading, Demonstrating and Picketing in a Capitol Building

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

The U.S. Probation Office calculated Weyer's criminal history as a category I, which is not disputed. PSR ¶ 53. Accordingly, the U.S. Probation Office calculated Weyer's total offense level at 17, and her corresponding Guidelines imprisonment range at 24-30 months, which is not disputed. PSR ¶ 93.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Weyer's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Weyer's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months' incarceration.

The nature and circumstances of Weyer's crimes weight heavily toward a term of incarceration.  Weyer was an active participate not a mere spectator.  She was part of the initial mob of rioters to breach the police barricade on the east side of the Capitol.  Not only did she

19

encourage others to pull down the metal barriers, she herself admitted she "personally help[ed] take down the barricades" and was "laser focused on breaking through the barriers and getting to the top of the Capitol Steps."  Nothing deterred her focus, not the police presence, the physical barriers, the blaring alarms, the threat of injury, or arrest.  Weyer pushed passed the severely outnumbered officers, forced her way through the mob, commanded that rioters hold their positions and charge forward, and assisted Oath Keepers – men and women in paramilitary uniforms – into the Capitol telling them, "go guys, we got you."  Indeed, her enthusiasm incited and encouraged others to continue their unlawful behavior.  Weyer was an active part of a large mass of rioters using their combined mass and extreme force and violence to breach the Capitol to prevent the peaceful transition of power.  Her words, taken in the context of her actions that day, invalidate any notion that Weyer breached the Capitol merely to engage in peaceful political commentary, as do her statements upon exiting the Capitol.  Weyer's flippant attitude regarding the degree of violence inflicted on police officers and others that day demonstrate an inability to appreciate the wrongness of her actions.

### B.  Weyer's History and Characteristics

Weyer's crimes on January 6 were not an isolated event in an otherwise law-abiding life.  Although all five of her criminal convictions were misdemeanors between 1982 and 1983, she was convicted on three separate occasions for disorderly conduct, including an instance where she screamed obscenities at law enforcement.  Consistent with her past conduct, she now comes before the Court to be sentenced for her disorderly and disruptive conduct in a restricted building or grounds (Count 3) and her disorderly conduct in a capitol building (Count 4).  Her continued contempt for authority is further demonstrated by her lack of meaningful participation with the PSR and her refusal to provide collateral contacts and sign releases of information.  PSR ¶58.  This

again shows her distrust of the law and her reluctance to accept the reality of her conviction, which is particularly disturbing when viewed in combination with her many attempts on and after January 6 to justify her actions.  Weyer comes before this Court a 60-year-old woman who is politically sophisticated.  She participated in lawful protests and understood the legal avenues available to protest the election results with which she disagreed.  Instead, she consciously decided to act illegally for the sole reason that she was upset her preferred candidate did not win.  Frustration at a political outcome is not a justification to participate in a violent insurrection.  The nature of the instant offense, including her attempts to justify her actions, coupled with her prior criminal conduct increases the likelihood that she will not ameliorate her behavior absent a lengthy sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Weyer's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Weyer has a criminal history category of I, her history of arrests and convictions show a clear pattern of behavior disregarding authority. Moreover, Weyer's encouragement of other rioters as "patriots" demonstrates that she sees herself as part of an existential battle against those who disagree with her views. Her words and her conduct show that she believes her crimes were justified because they were performed in the name of her political goals.

Notably, Weyer has never expressed remorse for her action. To the contrary, she is proud of her actions on January 6 and promoted her conduct as a call to arms for others. Her explosive rhetoric and statements on social media urging her followers to replicate what she and other rioters did at the U.S. Capitol at their local state Capitols is alarming. It also is evidence that Weyer distains the rule of law. Weyer does not regret her actions, as she stated she "would have done this months ago." Moreover, her flippant disregard for any criminal consequences is demonstrated by her statements on the East Capitol Steps after storming the Capitol Building: "they ain't gonna . . .charge all these patriots . . . [and] if they do, we'll do what they do in Pennsylvania when the restaurants . . . get a fine, they don't pay 'em." Any sentence she receives must be sufficient to provide specific deterrence from committing future acts of obstruction. For this reason, the government requests a sentence at the high end of the guidelines range.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. William Reid*, Case No. 1:21-CR-00316, Reid broke barricades—though on the West front—and helped other rioters climb up bike racks being used as make-shift ladders. He entered the Capitol through a broken window and encouraged other rioters to enter as well, remaining in the Capitol himself for approximately an hour.  At trial, Reid was convicted of violating 18 U.S.C. 1512(c)(2) and the same four misdemeanors of which Weyer has been convicted.  Judge Friedrich sentenced Reid to 37 months' incarceration and 36 months' supervised release, along with a $2,443 fine.  Like Weyer, Reid did not physically assault officers, nor was he charged with civil disorder. But his statements (like Weyer's) that he intended to "storm the Capitol," paired with his actions (like Weyer's) of helping break down barriers and encouraging other rioters to enter the building, and his lack of remorse (like Weyer's), shed light on the appropriate sentence for Weyer.

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Matthew Bledsoe*, Case No. 1:21-CR-00204, Judge Howell sentenced Bledsoe (convicted at trial of 8 U.S.C. 1512(c)(2) and the four misdemeanors of which Weyer has been convicted) to 48 months' incarceration and 36 months' supervised release, with a $2,000 fine. Like Weyer, who entered the East Rotunda doors within 15 minutes of the breach on the East Front, Bledsoe entered the Senate Wing Door close in time (within 15 minutes) of the breach on the West front and spent approximately 22 minutes inside the building, lingering outside the East Front after entering.  He also posted on social media before, during, and after the riot.  However, unlike Weyer, Bledsoe took the stand and—according to Judge Howell—obstructed justice by misleading the jury under oath.

In *United States v. John Strand*, Case No. 1:21-CR-85, the defendant went to trial on violations of 18 U.S.C. 1512(c)(2) and the four misdemeanors of which Weyer has been convicted. In sentencing Strand to 32 months' incarceration and 36 months' supervised release, with $2,000 in restitution and a $10,000 fine, Judge Cooper relied specifically on other cases where the defendant had gone to trial on a violation of 18 U.S.C. 1512(c)(2) and shown no remorse.  Like Weyer, Strand passed by Capitol Police Officers who had been attacked and entered through the East Rotunda doors.  Strand and his co-defendant took selfies of themselves and boasted on social media about having stormed the Capitol.  This mirrors the behavior of Weyer, who posted extensive videos during and after her breach of the Capitol.  However, unlike Weyer, Strand was attempting to profit from his involvement in January 6, which led to the $10,000 fine.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), from a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Both statutes support restitution here.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

27

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was both a "proximate cause" and actual cause of the victims' losses, the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Weyer to pay $2,000 in restitution for her convictions on Counts One through Five. This amount fairly reflects Weyer's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months' incarceration, the high end of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $170 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/  *Sarah C. Santiago*
SARAH C. SANTIAGO
Assistant United States Attorney
G.A. Bar No. 724304
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7249
sarah.santiago2@usdoj.gov

VICTORIA A. SHEETS
Assistant United States Attorney
NY Bar No. 5548623
601 D Street NW

District of Columbia, DC 20530
(202) 252-7566
victoria.sheets@usdoj.gov